808 F.Supp. 1425 (1992)
PEABODY HOLDING CO., INC., et al., Plaintiffs,
v.
COSTAIN GROUP PLC, et al., Defendants.
No. 4:92CV 002292 SNL.
United States District Court, E.D. Missouri, E.D.
December 11, 1992.
*1426 *1427 *1428 Michael J. Morris, Michael D. O'Keefe and W. Stanley Walch, Partners, Thompson and Mitchell, St. Louis, MO, for plaintiffs.
Glenn E. Davis, Frank N. Gundlach, Mary C. Kickham, Armstrong and Teasdale, St. Louis, MO, Michael Rowe Feagley, Priscilla Peterson Weaver, Michele Louise Odorizzi, Mayer and Brown, Chicago, IL, for defendants Costain Group PLC, Richard Costain (Holdings) Ltd., Costain America Inc. and Peter Costain.
Alan E. Popkin, Partner, David W. Sobelman, Husch and Eppenberger, St. Louis, MO, for defendant Altus Finance S.A.

MEMORANDUM
LIMBAUGH, District Judge.
This matter is before the Court upon the various defendants' Motions to Dismiss for Lack of Personal Jurisdiction and on the basis of Forum Non Conveniens. Defendant Costain Group PLC's Motion to Dismiss for Lack of Personal Jurisdiction based upon insufficient service of process has been ruled upon by this Court prior to the Court's addressing of these motions. The Court held that plaintiffs improperly served defendant Costain Group PLC, but allowed service to be remedied pursuant to 28 U.S.C. § 1448. In the above-styled action, plaintiffs filed a six-Count Complaint alleging that defendants: (1) breached a contract between plaintiffs and defendants; (2) tortiously interfered with the contract; (3) tortiously interfered with plaintiffs' prospective economic advantage; and (4) defrauded plaintiffs under the common law. Additionally, plaintiffs seek application of the doctrines of specific performance of contract and promissory estoppel.

*1429 I. Factual Background

There are two plaintiffs and five defendants in this action. Plaintiffs are Peabody Holding Company, Inc. (hereinafter "Peabody USA") and Peabody Resources, Limited (hereinafter "Peabody UK"). Peabody USA is a New York corporation with its principle place of business in St. Louis, Missouri. Peabody UK is incorporated under the laws of England and Wales with its principal place of business in London, England. Defendants are Costain America, Inc. (hereinafter "CAI"); Costain Group PLC (hereinafter "Costain Group"); Richard Costain (Holdings) Limited (hereinafter "Holdings"); Peter Costain (hereinafter "Mr. Costain"); and Altus Finance S.A. (hereinafter "Altus"). CAI is a Delaware corporation with its principal place of business in Chicago, Illinois. CAI is an indirect subsidiary of Costain Group, which is an English corporation with its principal place of business in London, England. Holdings is also an indirect subsidiary of Costain Group and is an English corporation whose principal place of business is in London, England. Mr. Costain, the Group Chief Executive of Costain Group, is an Australian subject who resides in London, England. Altus is a corporation organized and existing under the laws of France.
Plaintiff alleges that on or about July, 1992, Peabody USA commenced negotiations with Costain Group for the purchase of both Costain's Australian and United States coal operations. Peabody USA insisted on good-faith bargaining, and insisted upon and was granted the exclusive right to negotiate for the acquisition of such properties. Initially, such right was granted until September 21, 1992, pursuant to a letter agreement dated September 3, 1992. The parties ultimately discontinued the negotiations for a possible transaction involving Costain Group's United States coal operations, but continued negotiations and Peabody USA conducted a "due diligence" investigation concerning the Australian coal operations. Costain Resources Limited (hereinafter "CRL") directly or indirectly owns and operates all of the Australian coal businesses of Costain Group. Costain Group and Holdings, directly or indirectly through subsidiaries and affiliates, own 100 percent of the outstanding common stock of CRL. Costain Group reserved the right to terminate negotiations if an agreement regarding the Australian coal assets was not reached by September 21, 1992.
Plaintiff further alleges that in or about mid-September, 1992, and pursuant to a request by Irl Englehardt, President and Chief Executive Officer of Peabody USA, Mr. Costain orally agreed to extend the exclusivity period for so long as the parties were engaged in good faith negotiations for the purchase of the Australian coal operations. Peabody USA continued to examine CRL during the alleged extended exclusivity period. All parties agree that some of the face-to-face negotiating sessions between Peabody USA and Costain Group were held in the United States, in St. Louis and Chicago. Plaintiff contends that during such period, representatives of Costain Group failed to disclose to Peabody USA that other companies, including Altus, were being spoken to by Costain Group about the Australian properties.
On or about October 16, 1992, Costain's financial advisor, Goldman Sachs & Co. (hereinafter "Goldman") allegedly contacted Peabody USA to inform it that Costain was negotiating the sale of its Australian coal operations to a third party, later identified to be Altus, and such third party had offered $210 million for the coal operations. Representatives of Peabody USA allegedly informed Goldman that it had an exclusivity agreement with Costain Group and that Peabody USA would not increase its $200 million offer.
Plaintiff avers that on or about October 19, 1992, Goldman once again contacted Peabody USA to inform it that this third-party bidder, Altus, had increased its bid to $220 million. Representatives of Peabody USA responded by stating that Costain Group, by negotiating with another bidder, was violating the exclusivity agreement contained in the September 3, 1992 letter, and would be sued for breach of such agreement if it continued its conduct. Shortly thereafter, Goldman informed Peabody *1430 USA that the Board of Directors of Costain Group had taken the above-referenced statements by Peabody USA under advisement, and had accepted the Peabody USA and Peabody UK offer.
On or about October 20, 1992, Costain Group and Peabody UK entered into a written Share Purchase Agreement (hereinafter "the Agreement"), pursuant to which Costain Group agreed to sell and Peabody UK agreed to buy all of the shares of Holdings (and thereby acquire all of CRL and its assets) for $200 million plus certain other additional consideration. The sale was made subject to, among other things, the approval of Costain Group's shareholders and lenders. The closing was scheduled to take place on December 15, 1992. Plaintiff alleges that Costain Group, although previously stating the difficulties associated with obtaining approval of its shareholders, never forwarded the necessary proxies to its shareholders in connection with the sale of its Australian coal operations to Peabody UK.
When the agreement was executed, it was publicly announced. In such announcement, Peabody UK stated that it had been agreed upon that Peabody USA would operate and manage the Australian coal properties which were being acquired by Peabody UK. Plaintiff alleges that Section 4.1(d) of the Agreement provided that "neither Costain Group nor any of its affiliates, nor any of their respective employees, officers, directors, agents or other representatives, directly or indirectly shall" solicit any proposals to purchase the shares of Holdings or the CRL coal business, provide non-public information to such prospective purchasers, negotiate with respect to any proposal to purchase such business, or enter into any agreement or understanding for the sale of such business. Plaintiff further contends that the only exception was provided in the event of an "unsolicited proposal," and even then the right to negotiate was subject to Costain Group's "good faith judgment (after taking legal advice from its external solicitors) [that] such action is required by applicable law, by the fiduciary duties of [Costain Group's] directors, or by the City Code on Takeovers and Mergers." Plaintiffs also allege that such section further provided that in the event a third-party transaction was entered into pursuant to this "fiduciary out" clause, Costain should "pay to [Peabody UK] on demand, ... an amount in cash equal to $5 million." Plaintiffs contend that notwithstanding the foregoing exclusivity agreement and the Agreement and Costain Group's oral and written representations, Costain Group, CRL and/or their employees, officers and representatives were negotiating with Altus or its representatives and deliberately concealing such facts from Peabody USA and Peabody UK. Plaintiffs further contend that Altus engaged in such negotiations and ultimately entered into an agreement with Costain Group despite knowing of Costain's contractual and other obligations. On November 9, 1992, Costain Group announced that it had entered into an agreement with a subsidiary of Altus for the acquisition of the Australian coal business which Peabody UK had contracted to purchase, as well as certain additional assets which were not the subject of the agreement between Peabody UK and Costain Group.
Defendants allege that on October 7, 1992, Costain Group wrote a letter to Peabody USA confirming that Peabody USA had ceased pursuing an acquisition of the US coal assets and that the promise of exclusivity was no longer in force. Costain Group stated that it would continue working toward an agreement on the Australian coal assets, but without any promise of exclusive negotiating rights. In a response dated October 8, 1992, Peabody USA confirmed that it was no longer interested in the US coal assets, but disagreed with Costain Group's statement that the exclusivity arrangement had expired. Peabody USA asserted that Mr. Costain had orally agreed during a telephone conversation to extend its exclusive negotiating rights for as long as good faith negotiations continued concerning the Australian coal assets. Defendants further allege that Costain Group sent a reply the next day contradicting Peabody USA's version of the telephone conversation and reiterating its view that *1431 Peabody USA's exclusive negotiating rights had expired on September 30, 1992 (when the parties had failed to enter into a definitive agreement). Costain Group also reminded Peabody USA that Costain had asked for a written memorandum of understanding in order to ensure that both sides fully understood their obligations during negotiations, but Peabody USA had rejected the idea. Costain Group allegedly closed by once again stating its intent to continue to try to reach an agreement with Peabody USA.
Defendants contend that following an unsolicited approach, between October 8th and October 19th, Costain Group had discussions in England with defendant Altus concerning a possible purchase of the Australian coal assets. Defendants admit that the French deal did not go through and on October 19, 1992 (effective as of October 20, 1992) Costain Group executed the Agreement with Peabody UK. Defendants further contend that section 4.1(d) of the Agreement allowed Costain Group to accept another bid for the same assets if the bid was unsolicited and the Costain Group directors concluded in good faith that they were obliged by English law and/or their fiduciary duties to recommend the competing bid to their shareholders.
Defendants allege that after the Agreement was signed with Peabody UK, Altus came back with a new unsolicited offer to purchase all of Costain Group's Australian assets, including the coal assets, certain real property assets, and an interest in a directional drilling activity, for $245 million plus certain additional consideration. Defendants further allege that Costain Group's directors concluded that this unsolicited offer was superior to the Peabody UK offer, that it was in the best interests of the Costain Group's shareholders and that they therefore had a duty to recommend it to the shareholders. Accordingly, on November 6, 1992, Costain Group entered into an agreement with an Altus subsidiary to purchase all of the Australian assets.

II. Defendants' Motions to Dismiss for Lack of Personal Jurisdiction
Defendant Mr. Costain's, defendant Altus', and defendant Holdings' Motions to Dismiss for Lack of Personal Jurisdiction must be ruled upon. As noted previously, defendant Costain Group's Motion to Dismiss for Lack of Personal Jurisdiction has been ruled upon prior to the filing of this Memorandum. The remaining defendants have all based their Motions to Dismiss for Lack of Personal Jurisdiction upon the following arguments: (1) insufficient service of process; (2) the Missouri long-arm statute does not confer personal jurisdiction; and (3) exercise of personal jurisdiction would violate constitutional due process.
A district court has broad discretion in deciding the manner in which to resolve personal jurisdiction questions. Gibbs v. Buck, 307 U.S. 66, 71-72, 59 S.Ct. 725, 728-29, 83 L.Ed. 1111 (1939). It is well settled that the party seeking to invoke the jurisdiction of a federal court has the burden of establishing that jurisdiction exists. Mountaire Feeds, Inc. v. Agro Impex, S.A., 677 F.2d 651, 653 n. 3 (8th Cir. 1982) (citations omitted). "The Court may rely on pleadings and affidavits alone or require that an evidentiary hearing be held[.]" Cantrell v. Extradition Corp. of America, 789 F.Supp. 306, 308 (W.D.Mo. 1992). In CutCo Industries, Inc. v. Naughton, 806 F.2d 361, 364 (2d Cir.1986) (which has been cited with approval by the Eighth Circuit Court of Appeals in Watlow Electric Mfg. Co. v. Patch Rubber Co., 838 F.2d 999, 1000 (8th Cir.1988)), the Court stated:
Whatever procedural path the district court chooses to follow determines the plaintiff's burden of proof and the standard to be applied on appeal. If the court chooses to rely on pleadings and affidavits, the plaintiff need only make a prima facie showing of personal jurisdiction over defendant. But if the court holds an evidentiary hearing  in a manner similar to determining the issue at trial  the plaintiff must demonstrate that personal jurisdiction by preponderance of the evidence.
*1432 Id. "If the court rules on written submissions alone, the plaintiff may not rest on his pleadings to answer the movant's affidavits, but must set forth, `by affidavit or otherwise[,] ... specific facts showing that the court has jurisdiction.'" Serras v. First Tennessee Bank Nat. Ass'n, 875 F.2d 1212, 1214 (6th Cir.1989) (citations omitted). The plaintiff's burden, therefore, is "merely that of making a prima facie showing that jurisdiction exists." Id. (citation omitted). See also, Nollman v. Armstrong World Industries, Inc., 603 F.Supp. 1168, 1170 (E.D.Mo.1985); Aaron Ferer & Sons Co. v. Diversified Metals Corp., 564 F.2d 1211, 1215 (8th Cir.1977).
In order to determine whether personal jurisdiction may properly be exercised over a non-resident defendant, the Court should apply a two-part analysis. The Court first ascertains whether the applicable state long-arm statute confers jurisdiction. Falkirk Mining Co. v. Japan Steel Works, Ltd., 906 F.2d 369, 372 (8th Cir.1990). If it does, then the Court must decide whether the exercise of personal jurisdiction violates the due process clause of the fourteenth amendment. Id. at 372-73. With these standards in mind, the Court will now address defendants' Motions to Dismiss for Lack of Personal Jurisdiction.

A. Missouri Long-Arm Statute
The Missouri long-arm statute, Mo.Rev. Stat. § 506.500, provides in pertinent part:
1. Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any such acts:
(1) The transaction of any business within this state;
(2) The making of any contract within this state;
(3) The commission of a tortious act within this state;
(4) The ownership, use, or possession of any real estate situated in this state;
* * * * * *
3. Only causes of action arising from acts enumerated in this section may be asserted against a defendant in an action in which jurisdiction over him is based upon this section.
Mo.Rev.Stat. § 506.500. "The legislature, in enacting this statute, sought to extend the jurisdiction of Missouri courts to numerous classes of out-of-state defendants who could not have been sued in Missouri under the preexisting law." State ex rel Metal Service Center of Georgia, Inc. v. Gaertner, 677 S.W.2d 325, 327 (Mo.1984) (en banc).
Section 506.500.1(1) confers jurisdiction over nonresidents entering into various kinds of transactions with Missouri residents. The "transaction of any business" test is construed broadly so that long-arm jurisdiction is proper even if the nonresident is not qualified to do business in Missouri. Id. (citation omitted). See also, Sales Service, Inc. v. Daewoo Int'l (America) Corp., 719 F.2d 971, 972 (8th Cir.1983). "The business may consist of a single transaction, if that is the transaction sued upon." State ex rel Metal Service Center of Georgia, Inc., 677 S.W.2d at 327. In Boatmen's First National Bank v. Bogina Petroleum Engineers, 794 S.W.2d 703, 704 (Mo.Ct.App.1990) the Court held that "only one trip by [the defendant] to Missouri ... would have constituted the transaction of any business in this state sufficient to confer jurisdiction on Missouri courts and to authorize service under the long arm statute." Id. See also, Watlow Electric Mfg. Co. v. Sam Dick Industries, Inc., 734 S.W.2d 295, 298 (Mo.Ct.App.1987); State ex rel Caine v. Richardson, 600 S.W.2d 82, 84 (Mo.Ct.App.1980); State ex rel Farmland Industries, Inc. v. Elliott, 560 S.W.2d 60, 63 (Mo.Ct.App.1977). Jurisdiction has been held to attach based upon as little as a single meeting or conference in Missouri, if the meeting or conference is in connection with the contract at issue. See American Hoechst Corp. v. Bandy Laboratories, Inc., 332 F.Supp. 241, 243 (W.D.Mo.1970).
*1433 Section 506.500.1(2) confers jurisdiction over nonresidents who make contracts within the state of Missouri. A contract which has been accepted in Missouri is deemed to have been made in Missouri for purposes of jurisdiction under the Missouri long-arm statute. See Commercial Design, Inc. v. Dean/Dale and Dean Architects, 584 F.Supp. 890, 893 (E.D.Mo.1984); Shady Valley Park & Pool, Inc. v. Dimmic, 576 S.W.2d 579, 580 (Mo.Ct.App.1979).
Section 506.500.1(3) confers jurisdiction over nonresidents who commit tortious acts within the State of Missouri. To commit a tortious act in Missouri, it is not necessary that the tortfeaser was actually present in Missouri, but only that the extra-territorial acts have consequences in the forum. Sun World Lines, Ltd. v. March Shipping Corp., 585 F.Supp. 580, 584 (E.D.Mo.1984) (citations omitted); Nelson v. R. Greenspan & Co., Inc., 613 F.Supp. 342, 345 (E.D.Mo.1985) (citations omitted). In Pfeiffer v. International Academy of Biogmagnetic Medicine, 521 F.Supp. 1331, 1336 (W.D.Mo.1981), the Court held:
[A] non-resident defendant "commits a tortious act within the state" and subjects itself to suit in the state ... when, through wholly extra-territorial acts it sets in motion a course of action deliberately designed to move into the forum state in order to injure plaintiff's business. Therefore, even under the fictitious assumption that defendants' overt acts were committed wholly outside the state, defendants are still deemed to have committed a tortious act within the state because they allegedly set in motion a course of action deliberately designed to move into the forum state in order to injure plaintiff's business.
Id. See also, State ex rel Ranni Assoc. v. Hartenbach, 742 S.W.2d 134, 139 (Mo.1987) (en banc) (citation omitted). "Because the jurisdictional facts, where jurisdiction is based upon a single tort, are identical to the merits of the claim, plaintiffs must make a prima facie showing that defendant has in fact committed the tort alleged in the complaint." Nollman, 603 F.Supp. at 1171 citing Block Industries v. DHJ Industries, Inc., 495 F.2d 256, 259 (8th Cir. 1974). See also, Institutional Food v. Golden State Strawberries, 587 F.Supp. 1105, 1111 (E.D.Mo.1983). "`[T]he establishment of a prima facie case requires more than the allegation that the defendant' committed the tort." Nollman, 603 F.Supp. at 1172 (citation omitted). "The plaintiff must allege facts from which it could be found that all the elements of the tort are met." Id. (citation omitted). With these standards in mind, the Court now examines whether defendants are subject to jurisdiction under the Missouri long-arm statute.

1. Defendant Altus

Based upon plaintiffs' allegations, defendant Altus could only be subject to jurisdiction under the Missouri long-arm statute based upon the "commission of a tortious act" provision of the statute. Defendant Altus argues in its Motion to Dismiss that neither plaintiff made a prima facie showing that Altus had in fact committed the torts alleged in plaintiffs' Complaint. The Court would like to note that the parties agree that for the limited purposes of this motion only, Missouri law will be used. The Court believes that it is defendants' contention that English law is applicable as to this action.
Plaintiffs contend that Altus tortiously interfered with a contract between Peabody UK and Costain Group (the Agreement) and tortiously interfered with a prospective economic advantage offered to plaintiffs. In Community Title v. Roosevelt Federal S & L, 796 S.W.2d 369, 372 (Mo.1990) (en banc) (citation omitted), the Missouri Supreme Court stated:
A claim for tortious interference with a contract or business expectancy requires proof of each of the following: (1) a contract or valid business expectancy [not necessarily a contract]; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct.
*1434 Id. Defendant Altus argues that plaintiffs' Complaint neither alleges facts which would indicate that Altus intentionally interfered by inducing or causing a breach of the contract or relationship or would indicate that there was an absence of justification. In Tri-Continental Leasing Co. v. Neidhardt, 540 S.W.2d 210, 215 (Mo.App. 1976), the Court stated that "the concept of causation is inherent within the meaning of inducement; therefore, to establish liability in a tortious interference with contract case, the plaintiff must show that the defendant's acts caused the breach." Id. (citation omitted). Plaintiffs' Complaint alleges that defendant Altus engaged in negotiations with defendant Costain Group, its affiliates, and their executives, agents or representatives despite knowing of Costain Group's contractual and other obligations. This, in the Court's opinion, would be sufficient to establish that defendant Altus' acts caused the breach. As to the absence of justification, plaintiffs' Complaint alleges that Altus' engagement in negotiations was wrongful conduct. The absence of justification includes employment of wrongful means. Conoco v. Inman Oil Co., Inc., 774 F.2d 895, 907 (8th Cir.1985) citing Restatement (Second) of Torts, § 768.
As discussed above, the commission of an extraterritorial tortious act must have consequences within the state of Missouri in order for the long-arm statute to confer jurisdiction. Plaintiffs' Complaint alleging tortious interference with contract and tortious interference with prospective economic advantage alleges consequences within the state of Missouri. Peabody USA alleges a business expectancy based upon the publicly announced agreement between Peabody UK and Peabody USA that Peabody USA would operate and manage the Australian coal properties. Plaintiffs further allege that Altus' intentional interference with the contract between Peabody UK and Costain Group damaged Peabody USA in that Peabody USA would no longer be able to manage and operate the coal properties. This is sufficient in order to allege the commission of extraterritorial acts which have consequences within the state of Missouri for purposes of the tort provision of the long-arm statute. Thus, it is the opinion of this Court that the Missouri long-arm statute confers jurisdiction upon defendant Altus based upon the "commission of a tortious act" provision because plaintiffs have made a prima facie showing that defendant Altus has committed the torts alleged in plaintiffs' Complaint.

2. Defendant Peter Costain

Based upon plaintiffs' allegations, defendant Mr. Costain could be subject, at the most, to jurisdiction under the Missouri long-arm statute based upon the "commission of a tortious act" provision, the "making of a contract" provision, and the "transaction of business" provision. Defendant Mr. Costain argues in his Motion to Dismiss that plaintiffs did not make a prima facie showing that Mr. Costain had in fact committed the torts alleged in plaintiffs' Complaint. Furthermore, Mr. Costain argues that the fiduciary shield doctrine precludes the exercise of jurisdiction over him. Mr. Costain does not address whether the Missouri long-arm statute confers jurisdiction based upon the contract and business transaction provisions, but rather argues that the exercise of jurisdiction as to the non-tort claims would violate due process.[1]
First, Mr. Costain argues that plaintiffs have failed to allege facts from which it could be found that he has committed the Missouri tort of fraudulent misrepresentation. Under Missouri law, a plaintiff may prevail on the merits of a fraud claim only by showing that: (1) the defendant made a representation; (2) the representation was false; (3) the representation was material; (4) the defendant knew it was false; (5) the defendant intended the plaintiff to act on the representation and in the manner reasonably contemplated; (6) the plaintiff did *1435 not know that the representation was false; (7) the plaintiff relied upon the representation; (8) the plaintiff had a right to rely on the representation; and (9) the representation proximately cause the plaintiff's damages. Sofka v. Thal, 662 S.W.2d 502, 506 (Mo.1983) (en banc) (citation omitted).
Mr. Costain argues that plaintiffs have failed to make a prima facie showing as to fraud based upon the element of reliance. However, plaintiffs have alleged in their Complaint facts from which it could be found that the element of reliance is met. In plaintiffs' Complaint, plaintiffs allege that they "expended time and resources negotiating with Costain Group, conducting due diligence, and preparing and executing and working toward consummation of the agreement." Plaintiffs' Complaint, ¶¶ 55, 56.
Mr. Costain also argues that plaintiffs have failed to allege facts from which it could be found that he has committed the torts of tortious interference of contract and tortious interference with prospective economic advantage. The elements of these torts have been set out in Section II.A.1. See Community Title, 796 S.W.2d at 372. Mr. Costain contends that plaintiffs failed to allege facts regarding the elements of: (1) absence of justification; and (2) contract or business expectancy. As discussed in Section II.A.1., plaintiffs' Complaint alleges that Costain Group and its representatives' engagement in negotiations was wrongful conduct. The absence of justification includes employment of wrongful means. Conoco, 774 F.2d at 907 citing Restatement (Second) of Torts, § 768. Furthermore, plaintiffs allege a business expectancy based upon the publicly announced agreement between Peabody UK and Peabody USA that Peabody USA would operate and manage the Australian coal properties. Thus, it is the opinion of this Court that the Missouri long-arm statute confers jurisdiction upon defendant Mr. Costain based upon the "commission of a tortious act" provision because plaintiffs have made a prima facie showing that defendant Mr. Costain has committed the torts alleged in plaintiffs' Complaint.
Finally, Mr. Costain argues that the fiduciary shield doctrine precludes the exercise of jurisdiction over him. Some courts have refused, under the fiduciary shield doctrine, to exercise personal jurisdiction over individual corporate officers. "[I]f an individual has contact with a particular state only by virtue of his acts as a fiduciary of the corporation, he may be shielded from the exercise, by that state, of jurisdiction over him personally on the basis of that conduct." Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 902 (2d Cir.1981).
In Cantrell v. Extradition Corp. of America, 789 F.Supp. 306, 310 (W.D.Mo. 1992), the Court noted that Missouri courts have not addressed the issue and rejected the fiduciary shield doctrine. The Court stated that "[i]n the absence of direct guidance from Missouri on this issue, [the Court would] rely on the Missouri courts' interpretation of its long-arm statute as permitting jurisdiction essentially as broad as is authorized by the United States Constitution." Id. This Court agrees with Cantrell and in the absence of guidance from Missouri, will not create a new restriction upon the exercise of long-arm jurisdiction in the state of Missouri.

3. Defendant Richard Costain (Holdings) Ltd.

Based upon plaintiffs' allegations, defendant Holdings could, at the most, be subject to jurisdiction under the Missouri long-arm statute based upon the "commission of a tortious act" provision, the "making of a contract" provision, and the "transaction of business" provision. Defendant Holdings argues in its Motion to Dismiss that: (1) Holdings did not enter into any contract in Missouri; (2) Holdings did not transact any business in Missouri; and (3) plaintiffs have failed to make a prima facie showing that defendant committed a tort within Missouri. Holdings has submitted several affidavits in support of its arguments.
Plaintiffs have submitted the affidavits of Irl F. Englehardt and John E. Lushefski which aver that they both "believed and *1436 understood that all of the Costain representatives were acting for or on behalf of all of the Costain entities, including without limitation ... Richard Costain (Holdings) Limited,.... This is the extent of plaintiffs' evidence supporting personal jurisdiction over Holdings. Defendants have submitted the affidavits of Peter J. Costain, Geoffrey Langham, Peter J. Hill, Peter Nicoll who all indicate that they represented Costain Group PLC, not Holdings, in the St. Louis negotiations and that the agreements involved Costain Group, not Holdings. Plaintiffs have not been able to refute these affidavits or obtain further evidence with regard to Holdings' participation in the Missouri meetings, as to Holdings' participation in the negotiations with Altus, or as to Holdings' involvement in any contracts due to a stay upon discovery pending resolution of the jurisdictional issues by this Court. The jurisdictional evidence presented so far as to defendant Holdings is insufficient for this Court to make a determination as to whether personal jurisdiction should be exercised by the Court over defendant Holdings. It is, therefore, the opinion of this Court that prior to ruling upon defendant Holdings' Motion to Dismiss for Lack of Subject Matter Jurisdiction, the Court should hold an evidentiary hearing solely for the purpose of determining whether personal jurisdiction over Holdings exists.

B. Constitutional Due Process
A defendant has a "liberty interest in not being subject to the binding judgments of a forum with which he has no meaningful `contacts, ties, or relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72, 105 S.Ct. 2174, 2181, 85 L.Ed.2d 528 (1985) citing International Shoe Co. v. Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). Thus, due process requires as a jurisdictional prerequisite that a defendant have contacts with the forum state "such that the maintenance of a suit does not offend `traditional notions of fair play and substantial justice.'" International Shoe Co., 326 U.S. at 316, 66 S.Ct. at 158.
The proper focus for analyzing the sufficiency of a defendant's contacts with the forum state is whether they represent an effort by it to "purposefully avail[] [it]self of the privileges of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). The United States Supreme Court has emphasized the importance of showing that a non-resident defendant has taken some action purposefully directed toward the forum state:
This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts ... or of the "unilateral activity of another party or a third person," .... Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that creates a "substantial connection" with the forum state.
Burger King Corp., 471 U.S. at 475, 105 S.Ct. at 2183 (citations omitted) (emphasis in original). Additionally, the defendant's conduct and connection with the forum state must be such that defendant "should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (citations omitted).
The Supreme Court has noted the "unique burdens placed upon one who must defend oneself in a foreign legal system," and has indicated that those burdens "should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987). The Asahi court went on to state:
The procedural and substantive interests of other nations in a state court's assertion of jurisdiction over an alien defendant will differ from case to case. In every case, however, those interests, as well as the Federal Government's interest in its foreign relations policies, will *1437 be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State. "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field."
Id. at 115, 107 S.Ct. at 1034 (citations omitted).
In order to determine whether personal jurisdiction comports with the requirements of due process in any particular case, the Eighth Circuit considers five factors:
(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.
Sybaritic, Inc. v. Interport Intern, Inc., 957 F.2d 522, 524 (8th Cir.1992) (citation omitted). "This analytical framework incorporates the notions of both `minimum contacts' and `fair play and substantial justice'" Id. (citation omitted).
Furthermore, "[a] single tortious act is sufficient to support personal jurisdiction consistent with due process standards." Nelson, 613 F.Supp. at 346 (citations omitted). See also, Ranni Assoc., 742 S.W.2d at 139; Sun World Lines, 585 F.Supp. at 584. With these standards in mind, the Court will now examine whether the exercise of personal jurisdiction over defendants will violate constitutional due process.

1. Defendant Altus

In plaintiffs' Complaint, plaintiffs allege that defendant Altus tortiously interfered with a contract and tortiously interfered with plaintiffs' prospective economic advantage. As stated above, it is the opinion of the Court that plaintiff has made a prima facie showing, sufficient to confer jurisdiction under the Missouri long-arm statute, that Altus committed the torts alleged in plaintiffs' Complaint. Defendant Altus argues that even if there is jurisdiction under the long-arm statute, the exercise of personal jurisdiction over Altus would violate due process.
Plaintiffs' Complaint does not allege any contacts which Altus had with Missouri beyond the extraterritorial acts which allegedly have consequences in Missouri. The question before the Court, therefore, is whether those tortious acts, in themselves, would support the exercise of personal jurisdiction without violating due process. Several cases under Missouri law have held that a plaintiff may not invoke tortious long-arm jurisdiction consistent with due process where the non-resident defendant had no contact with Missouri besides the extraterritorial acts having consequences in Missouri. See Hanline v. Sinclair Global Brokerage Corp., 652 F.Supp. 1457, 1460-61 (W.D.Mo.1987); Hasty v. PACCAR, Inc., 583 F.Supp. 1577, 1580 (E.D.Mo. 1984); School District of Kansas City v. State of Missouri, 460 F.Supp. 421, 435 (W.D.Mo.1978); State ex rel Sperandio v. Clymer, 581 S.W.2d 377, 382-83 (Mo.1979) (en banc); State ex rel Wichita Falls General Hospital v. Adolf, 728 S.W.2d 604, 609 (Mo.Ct.App.1987).
The Court agrees with the line of reasoning of these cases. Altus does not transact business in the state of Missouri; does not maintain offices in Missouri; maintains no bank accounts and has no security interests, real or personal property, or other assets in Missouri; did not participate in any negotiations in Missouri; and did not make telephone calls or receive telephone calls from Missouri or send or receive any written communications from Missouri in connection with these transactions. As in the above-cited cases, Altus did not purposefully avail itself of the privileges of conducting activities within the forum State, thereby invoking the privileges and protections of Missouri law. The limited contact which Altus has with Missouri, based solely upon the impact of its alleged tortious activity, is so attenuated that the maintenance of a suit would offend traditional *1438 notions of fair play and substantial justice. Thus, it is the opinion of this Court that defendant Altus' Motion to Dismiss for Lack of Personal Jurisdiction should be granted because Altus' lack of contacts with Missouri are such the exercise of personal jurisdiction over Altus would violate constitutional due process.

2. Defendant Peter Costain

In plaintiffs' Complaint, plaintiffs allege that defendant Mr. Costain tortiously interfered with a contract and tortiously interfered with plaintiffs' prospective economic advantage; defrauded plaintiffs; and breached a contract. As stated above, it is the opinion of this Court that plaintiff has made a prima facie showing that Mr. Costain committed the torts alleged in plaintiffs' Complaint. Defendant Mr. Costain argues that even if the Missouri longarm statute confers jurisdiction, the exercise of personal jurisdiction over Mr. Costain would violate due process.
In Mr. Costain's affidavit, he avers that he has never physically been present in Missouri; has never owned, used, or possessed any real estate in Missouri; has never entered into any contracts in Missouri; and to the best of his recollection, has never sent a document into Missouri. Mr. Costain does admit that he has spoken with Mr. Englehardt of Peabody USA in Missouri, by telephone, three or four times and placed one or two of those phone calls himself. He further avers that he had no knowledge at the time that the calls were made that the phone number was a Missouri number.
As noted in Section II.B.1., several cases under Missouri law have held that a plaintiff may not invoke tortious long-arm jurisdiction consistent with due process where the non-resident defendant had no contact with Missouri other than the extraterritorial acts having consequences in Missouri. See Hanline, 652 F.Supp. at 1460-61; Hasty, 583 F.Supp. at 1580; School District of Kansas City, 460 F.Supp. at 435; Sperandio, 581 S.W.2d at 382-83; and Wichita Falls General Hospital, 728 S.W.2d at 609. Plaintiffs argue, however, that in addition to there being consequences, in Missouri, based upon Mr. Costain's alleged tortious activity, Mr. Costain had contact with the State of Missouri through telephone calls made and received by him concerning the subject matter of this litigation and such calls are the basis for plaintiffs' fraud claim and possibly created a contract relating to this cause.
Several decisions by the Eighth Circuit Court of Appeals have held that the use of interstate telephone facilities into the forum state is not a purposeful availment of the privileges of conducting business in that state. In Mountaire Feeds, Inc., 677 F.2d at 656, the Court stated:
Although the parties did make telephone calls, exchange correspondence, and use banks to arrange payment, "the use of arteries of interstate mail, telephone, railway, and banking facilities is insufficient, standing alone, to satisfy due process.
Id. quoting Aaron Ferer & Sons Co. v. Atlas Scrap Iron & Metal Co., 558 F.2d 450, 453 (8th Cir.1977) (emphasis added). In Scullin Steel Co. v. National Ry. Utilization Corp., 676 F.2d 309, 314 (8th Cir. 1982), the Court held that "The use of interstate facilities (telephone, the mail), the making of payments in the forum state, and the provision for delivery within the forum state are secondary or ancillary factors and cannot alone provide the `minimum contacts' required by due process." Id. (citation omitted) (emphasis added).
The distinction that plaintiffs argue in these cases is that in addition to Mr. Costain's allegedly tortious extraterritorial acts which had consequences in Missouri, defendant Mr. Costain further purposefully availed himself of the privileges of conducting business in the state by his use of telephone calls into Missouri, at which time the alleged tortious activity occurred and possibly one of the contracts concerning this litigation was made. As emphasized in the Eighth Circuit Court's opinions above, the use of telephone calls alone will not support the exercise of personal jurisdiction consistent with due process. However, in the present action, Mr. Costain's telephone calls into Missouri was only one contact *1439 which plaintiffs' have alleged. Plaintiffs have further alleged that Mr. Costain tortiously acted, both during these phone conversations to Missouri and at other times, and his actions were directed toward plaintiffs in Missouri and had consequences in Missouri. Furthermore, Mr. Costain's telephone negotiations with Peabody USA were directly related and linked to the negotiations which were occurring both in Missouri and elsewhere concerning the sale of the shares of Holdings.
It is the opinion of this Court that Mr. Costain's alleged actions are such that the exercise of personal jurisdiction over him would not violate constitutional due process. Mr. Costain's actions, taken as a whole, would indicate that he purposefully availed himself of the benefits of conducting business in Missouri. This conclusion is supported by Nelson v. R. Greenspan & Co., Inc., 613 F.Supp. 342 (E.D.Mo.1985). In Nelson, the Court stated that "[A] single tortious act is sufficient to support personal jurisdiction consistent with due process standard." Id. at 346 (citations omitted). The court went on to state:
Defendants' alleged misconduct[, negligent or intentional misrepresentation,] was "`purposefully directed' toward Missouri residents..... In these circumstances, personal jurisdiction over defendants does not offend `fair play and substantial justice,'" even though defendants never physically entered Missouri.
Id. (citations omitted). The Court then went on to find that personal jurisdiction was appropriate as to plaintiff's claim in Count II, a breach of contract claim, even though defendants' contacts with Missouri might not be sufficient for them to be subject to personal jurisdiction in Missouri with respect to Count II alone.
Thus, it is the opinion of this Court that the exercise of personal jurisdiction upon Mr. Costain would not violate constitutional due process because the alleged acts of Mr. Costain, directed towards Missouri, are sufficient minimum contacts such that the exercise of personal jurisdiction does not offend fair play and substantial justice.

C. Insufficient Service of Process
Plaintiffs filed a Petition in the Circuit Court of the City of St. Louis on November 9, 1992. Defendants filed a Notice of Removal on November 13, 1992 to remove this cause to federal court. On the day the Petition was filed, plaintiffs requested the Circuit Court to serve defendants by registered or certified mail pursuant to Mo.S.Ct.R. 54.16 and Mo.Rev.Stat. § 351.594. On the following day, the Circuit Court ordered expedited discovery in the case and ordered plaintiffs to telecopy copies of that order and the Petition to defendants. The telecopy procedure was followed in addition to, not in lieu of, the service of process that was instituted on the day of filing. The service of process by registered or certified mail was deemed completed no later than five days after it was mailed on November 12, 1992.
Defendants Altus, Mr. Costain and Holdings all argue that plaintiffs' purported service of process did not comply with the requirements of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Criminal Matters, 20 U.S.T. 361-67, T.I.A.S. § 6638. Although defendant Holdings' arguments as to personal jurisdiction in its Motion to Dismiss for Lack of Personal Jurisdiction will not be addressed until an evidentiary hearing may be held, the Court will address defendant Holdings' arguments as to the insufficiency of service of process.
The United States and the United Kingdom are both signatories to the Hague Convention. Article 10 of the Convention provides as follows:
Provided the State of destination does not object, the present convention shall not interfere with 
(a) the freedom to send judicial documents, by postal channels, directly to persons abroad,
(b) the freedom of judicial officers, officials, or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

*1440 (c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.
28 U.S.C.A. Fed.R.Civ.Pro. 4, note, at 212 (1992). In ratifying the Convention, the United Kingdom expressed the following reservation, among others:
(d) With reference to the provisions of paragraphs (b) and (c) of Article 10 of the Convention, documents for service through official channels will be accepted in the United Kingdom only by the central or additional authorities and only from judicial consular or diplomatic officers or other Contracting states.
28 U.S.C.A. Fed.R.Civ.Pro. 4, note, at 226. A number of other states, including Japan, have also objected or expressed reservations with respect to paragraphs (b) and (c) of Article 10, but have said nothing with respect to paragraph (a).
In Bankston v. Toyota Motor Corp., 889 F.2d 172 (8th Cir.1989), the United States Court of Appeals for the Eighth Circuit addressed defendants' argument as to whether the sending of a summons and Complaint by registered mail to a defendant in a foreign country is a method of service of process permitted under § 10(a) of the Hague Convention. The Court noted that two distinct lines of Article 10(a) interpretation have arisen. Id. at 173. "Some courts have ruled that Article 10(a) permits service of process by mail directly to the defendant without the necessity of resorting to the central authority, and without the necessity of translating the documents into the official language of the nation where the documents are to be served." Id. The Court adopted the second line of interpretation, however, holding that the "word `send' in Article 10(a) is not the equivalent of `service of process.'" Id. at 173-74. The Court noted:
the word "service" is specifically used in other sections of the Convention, including subsections (b) and (c) of Article 10. If the drafters of the Convention had meant for subparagraph (a) to provide an additional manner of service of judicial documents, they would have used the word "service." Subscribers to this interpretation maintain that Article 10(a) merely provides a method for sending subsequent documents after service of process has been obtained by means of a central authority.
Id.
Plaintiffs argue that this Court should not accept the holding of Bankston in the present case, given that it is the minority position and that there is no need for translation of documents. Translation of documents is not the only requirement that the more formal procedures of the Hague Convention require, however. There is also the requirement that service of process be made through a central authority. Plaintiff cites no reason as to why this requirement should not be met. Furthermore, this Court is under a duty to follow the existing Eighth Circuit caselaw. See United States Trustee v. Harris, 960 F.2d 74, 77 (8th Cir.1992); Richardson v. Miller, 716 F.Supp. 1246, 1273 n. 7 (W.D.Mo.1989).
Thus, it is the opinion of this Court that plaintiffs have failed to properly issue service of process to defendants Altus, Mr. Costain and Holdings as required by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Criminal Matters. Defendants request, therefore, that the Court dismiss plaintiffs' Complaint based upon the insufficient service of process. Plaintiffs argue that dismissal is inappropriate and that pursuant to 28 U.S.C. § 1448, they should be allowed to amend their service. The Court agrees with plaintiff. Title 28 U.S.C. § 1448 provides:
In all cases removed from any State court to any district court of the United States in which any one or more of the defendants has not been served with process or in which the service has not been perfected prior to removal, or in which process served proves to be defective, such process or service may be completed or new process issued in the same manner as in cases originally filed in such district court. *1441 28 U.S.C. § 1448. Plaintiffs, therefore, should be allowed to issue new process to defendants Mr. Costain and Holdings in compliance with this Court's Order and the Hague Convention within thirty days of the filing of this Order.[2]

III. Defendants' Motion to Dismiss on the Basis of Forum Non Conveniens
All of the defendants have joined in filing a Motion to Dismiss on Forum Non Conveniens. Plaintiffs oppose said motion. Defendants argue: (1) England provides an adequate alternative forum; (2) the balance of public and private interests strongly favors the English forum; and, (3) the public and private interest factors outweigh any deference given to plaintiff. Plaintiffs argue: (1) this cause is not a "rare" and "exceptional" circumstance for the application of forum non conveniens; (2) plaintiffs' choice of forum is entitled to substantial deference; (3) an English choice of law provision and the presence of English parties does not require dismissal; (4) England is not an adequate alternative forum; and (5) the private interests of the parties militate in favor of this Court retaining jurisdiction.
"`The principle of forum non conveniens permits a court to decline jurisdiction even though venue and jurisdiction are proper, on the theory that for the convenience of the litigants and witnesses, the action should be tried in another forum.'" Mizokami Bros. of Arizona v. Mobay Chemical Corp., 660 F.2d 712, 717 (8th Cir.1981) quoting Dahl v. United Technologies Corp., 632 F.2d 1027, 1029 (3d Cir. 1980). The principles that govern a motion to dismiss on forum non conveniens grounds are well settled. The Court must first determine whether there is an adequate alternative forum available in which the dispute can be resolved. If there is such a forum, the Court must balance a number of private and public interest factors in order to determine whether they outweigh the deference ordinarily attended to the plaintiff's choice of forum. See Mizokami Bros. of Arizona, 660 F.2d at 717-18 citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09, 67 S.Ct. 839, 842-43, 91 L.Ed. 1055 (1947).[3]
Important considerations as to the private interest of the litigant are such factors as the relative ease of access to sources of proof; availability of compulsory process for attendance of the unwilling and the cost of obtaining attendance of willing witnesses; the enforceability of a judgment if one is obtained; and all other practical problems that make trial of a case easy, expeditious and inexpensive. Mizokami Bros. of Arizona, 660 F.2d at 717 quoting Gilbert, 330 U.S. at 508-09, 67 S.Ct. at 842-43. Factors of public interest include a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflicts of laws, and in law foreign to itself. Mizokami Bros. of Arizona, 660 F.2d at 717-18 quoting Gilbert, 330 U.S. at 508-09, 67 S.Ct. at 842-43. The doctrine of forum non conveniens is applied only in "exceptional circumstances." Gilbert, 330 U.S. at 504, 67 S.Ct. at 840.
"The defendant has the burden of persuasion in proving all elements necessary for the court to dismiss a claim based on forum non conveniens." Reid-Walen v. Hansen, 933 F.2d 1390, 1393 (8th Cir.1991). Any conflicts as to the relevant facts are to be resolved in favor of plaintiffs. Acapolon *1442 Corp. v. Ralston Purina Co., 827 S.W.2d 189, 192 (Mo.1992) (en banc).

A. Adequate Alternative Forum
Defendants argue that England is an adequate alternative forum to the present forum. Plaintiffs, however, argue that England is not an adequate alternative forum because the procedures afforded plaintiffs would greatly differ. In Piper Aircraft Co. v. Reyno, 454 U.S. 235, 247, 254-55, 102 S.Ct. 252, 261, 265, 70 L.Ed.2d 419 (1981), the United States Supreme Court held that a forum is inadequate if the "remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all...." Id.
If England were selected as the forum of this dispute, plaintiffs would not have the ability to take pretrial depositions and would be more restricted in documentary discovery. Plaintiffs argue that this could greatly affect their remedy of injunctive relief in that with the pending sale between Altus and Costain Group, plaintiffs could not adequately prepare for a hearing on the issue of injunctive relief prior to the pending sale. Additionally, plaintiffs will have no right to a jury trial in England. Factors such as these have been found to be, in the least, factors which would support the denial of a motion to dismiss on forum non conveniens. See Wilson v. Humphreys (Cayman) Ltd., 916 F.2d 1239, 1246-47 (7th Cir.1990); Lehman v. Humphrey Cayman Ltd., 713 F.2d 339, 345 (8th Cir.1983), cert. denied 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984); Hansen, 933 F.2d at 1399. The Court, therefore, will not determine, based upon these factors alone, that England is not an adequate alternative forum, but will consider these factors in determining the balance of public and private interests in the forum.

B. Deference Given to Plaintiffs
The United States Supreme Court and the Eighth Circuit have always recognized that any forum non conveniens analysis must give substantial deference to the plaintiffs' choice of forum. See, e.g., Gilbert, 330 U.S. at 508; Lehman, 713 F.2d at 342. In Gilbert, the Supreme Court stated that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Gilbert, 330 U.S. at 508, 67 S.Ct. at 842. This rule is applied equally in Missouri courts. In Anglim v. Missouri Pacific Railroad Co., 832 S.W.2d 298, 302 (Mo.1992) (en banc), the Missouri Supreme Court stated that "a plaintiff's choice of forum is not to be disturbed except for `weighty' reasons and the case should be dismissed only if the `balance is strongly in favor' of the defendant." Id. (citation omitted).
When a plaintiff is a resident of the forum, the resident plaintiff's choice of forum is to be given greater deference that it is convenient and that forum non conveniens is inapplicable. Piper Aircraft Co., 454 U.S. at 255-56, 102 S.Ct. at 265-66; Acapolon, 827 S.W.2d at 192. The fact that there is also a non-resident plaintiff involved in the action does not affect the deference given to the resident's lawsuit. Fiacco v. United Technologies Corp., 524 F.Supp. 858, 861 (S.D.N.Y.1981). Defendants themselves have admitted that Peabody USA has a legitimate dispute with the defendants. Reply Memorandum of the Costain Defendants in Support of their Motion to Dismiss on Forum non Conveniens Grounds, p. 6. Additionally, Peabody UK is an affiliate of Peabody USA and Peabody USA was going to operate and manage the Australian coal properties, which are the subject of this lawsuit.
In Hansen, the Eighth Circuit Court of Appeals noted that:
At least when the plaintiff is a U.S. citizen with a real interest in the controversy, the plaintiff's forum choice always should be accorded substantial deference at the outset..... Only then should the district court analyze the Gilbert factors, keeping in mind that the defendant bears the burden of proof on each factor and must overcome the heavy presumption against disturbing the plaintiff's forum choice.
933 F.2d at 1396 (citation omitted) (emphasis in original). Thus, it is the opinion of *1443 this Court that plaintiffs' choice of forum should be given substantial deference.

C. Balance of Private and Public Interests
The essence of defendants' arguments, as to private interests, is that the doctrine of forum non conveniens is applicable because a large number of the witnesses reside outside of the United States and many of the documents necessary for the suit are also outside of the United States. Although some of the witnesses may be located outside of this country, their appearance in the United States for trial will not be an undue burden or inconvenience on defendants or the witnesses. "[T]he time and expense of obtaining the presence or testimony of foreign witnesses is greatly reduced by commonplace modes of communication and travel." Hansen, 933 F.2d at 1397 (citations omitted). This is especially true given that many of the witnesses to this lawsuit will reside in the United States and even in Missouri. This is similar to the Hansen decision, in which the Court noted that the defendants had not established that there were clearly more key witnesses available outside of the forum state, or that there would be a significantly greater problem in getting the testimony of the foreign witnesses if the case is tried in the United States than in getting the testimony of witnesses located in the United States if the case were tried elsewhere. Hansen, 933 F.2d at 1397 (citation omitted). Additionally, "[a]ny foreign witness testimony may be taken, if possible, by deposition or other means." Id. (citation omitted). This reasoning would also seem to apply to defendants' arguments as to the documents existing outside of the United States.
As to the public interest, defendants argue that English law is applicable and that England would be a more appropriate forum in which to decide the dispute. In Hansen, the Eighth Circuit Court of Appeals held that although Jamaican law applied to the suit, "it is well settled that the fact a federal court may have to apply foreign law is not dispositive on the forum non conveniens inquiry...." Hansen, 933 F.2d at 1401 (citations omitted). Additionally, in Lehman, the Court noted that "federal courts are quite capable of applying foreign law when required to do so.... We must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform." Lehman, 713 F.2d at 345. Furthermore, given that the one of the two plaintiffs' is a Missouri resident, Missouri has an interest in the dispute.
Thus, it is the opinion of this Court that defendants' Motion to Dismiss on Forum non Conveniens should be denied because defendants have failed to persuade this Court that the substantial deference given to the resident plaintiff is outweighed by the balance of public and private interests. As noted previously, this is especially true when early discovery and the right to a jury trial will be unavailable to plaintiffs in an English forum.

IV. Conclusion
It is the opinion of this Court that defendant Altus' Motion to Dismiss for Lack of Personal Jurisdiction should be granted. As to defendants Mr. Costain and Holdings, plaintiffs should issue new service of process upon these defendants in accordance with the memorandum filed herein and the Hague Convention. Defendant Mr. Costain's Motion to Dismiss for Lack of Personal Jurisdiction should be denied. Defendant Holdings' Motion to Dismiss for Lack of Personal Jurisdiction will not be ruled upon by this Court until an evidentiary hearing may be held. This will allow the Court to make a more fully informed decision as to whether the exercise of personal jurisdiction upon defendant Holdings is proper.[4] It is further the opinion of this Court that Defendants' Motion to Dismiss on Forum Non Conveniens should be denied. *1444 Therefore, the parties which will remain in this lawsuit, assuming that new service of process may be perfected upon defendants Costain Group, Holdings and Mr. Costain, will be CAI, Costain Group, Mr. Costain, and possibly Holdings, depending upon the outcome of the evidentiary hearing. It is finally the opinion of this Court that the stay upon discovery order by this Court should now be lifted and that proper discovery may proceed under the Federal Rules of Civil Procedure.

ORDER
In accordance with the Memorandum filed herein this day,
IT IS HEREBY ORDERED that defendant Altus' Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED.
IT IS FURTHER ORDERED that defendant Peter Costain's Motion to Dismiss for Lack of Personal Jurisdiction is DENIED.
IT IS FURTHER ORDERED that defendant Richard Costain (Holdings) Limited's Motion to Dismiss for Lack of Personal Jurisdiction is DENIED as to the issue of insufficient service of process. An evidentiary hearing will be held prior to the Court's ruling on the remaining issues in defendant Holdings' Motion to Dismiss for Lack of Personal Jurisdiction.
IT IS FURTHER ORDERED that plaintiffs issue new service of process to defendants Peter Costain and Richard Costain (Holdings) Limited, in accordance with the Memorandum filed herein and the Hague Convention, within 30 days of the filing of this Order.
IT IS FURTHER ORDERED that the stay upon discovery ordered by this Court is now lifted and that proper discovery may be conducted pursuant to the Federal Rules of Civil Procedure.
IT IS FINALLY ORDERED that defendants' Motion to Dismiss on Forum non Conveniens is DENIED.
NOTES
[1] Mr. Costain also contends that the exercise of jurisdiction as to the tort claims would violate due process.
[2] Defendant Altus has been dismissed from this cause based upon lack of personal jurisdiction. There is no reason, therefore, for new service of process to be issued upon defendant Altus.
[3] In Mizokami Bros. of Arizona, the Eighth Circuit noted that it was an open question whether state or federal law applies to forum non conveniens questions when federal jurisdiction is based on diversity. However, the Court found it unnecessary to decide that issue because the Missouri criteria for forum non conveniens are essentially the same as the federal criteria. Id., 660 F.2d at 719 n. 10. In Acapolon Corp. v. Ralston Purina Co., 827 S.W.2d 189, 195 (Mo. 1992) (en banc), the Missouri Supreme Court confirms this conclusion.
[4] The Court has addressed defendant Holdings argument that service of process was insufficient. The only remaining issues to be decided, therefore, in defendant Holdings' Motion to Dismiss for Lack of Personal Jurisdiction is whether: (1) the Missouri long-arm statute confers personal jurisdiction upon Holdings; and (2) the exercise of personal jurisdiction upon defendant Holdings would violate constitutional due process.